# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ONE WAY APOSTOLIC CHURCH, | ) | |
| | ) | |
| Plaintiff, | ) | No. 16 C 1132 |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge |
| EXTRA SPACE STORAGE, INC.; | ) | Maria Valdez |
| and JOHN DOE,[1] | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff's First Amended Complaint, premised on diversity jurisdiction, alleges breach of contract against Defendant Extra Space Storage, Inc. ("Extra Space"), and conversion against both defendants in relation to items Plaintiff had stored in a unit at Extra Space that were later foreclosed on and sold by Extra Space to John Doe. The matter is now before the Court on Defendant's Motion for Summary Judgment [Doc. No. 39]. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Defendant's motion is granted in part and denied in part.

---

[1] John Doe is identified in the parties' briefs as Terrill Kirk. Mr. Kirk, however, was never added as a named defendant and, to the Court's knowledge, has never been served with the complaint.

<u>**FACTS**</u>[2]

Plaintiff One Way Apostolic Church ("One Way") is located in Chicago, Illinois. (LR 56.1(a)(3) ¶ 2.) In November 2013, Noah Nicholson, the church's Pastor and President, entered into three contracts with a storage facility called Smart Stop located on Ogden Avenue in Cicero, Illinois. Nicholson rented three storage units – numbers 3008, 3429, and 3417 – in order to store church property. (*Id.* ¶¶ 5-6.) All three agreements contain the following provisions:

> 2.    RENT: . . . Rent is due each month on the FIRST day of the month, in advance and without demand. Owner reserves the right to require that rent and other charges be paid in cash, certified check, cashier's check or money order. . . . Owner, at Owner's sole discretion, may accept or reject partial rent payments. Acceptance of partial payments of rent by Owner shall not constitute a waiver of Owner's rights and Occupant understands and agrees that acceptance of a partial rent payment made to cure default for non payment [sic] of rent shall not delay or stop foreclosure on Occupant's stored property. ALL PAYMENTS MADE TO SATISFY OUTSTANDING LIEN AMOUNTS AND CHARGES SHALL BE PAID BY CERTIFIED CHECK, CASHIER'S CHECK, MONEY ORDER OR CASH.

(*Id.* ¶ 7.)

The contracts provide that a late fee will be assessed for payments made more than six days late, a lien fee for an account thirty or more days delinquent, and a lien foreclosure fee for an account sixty or more days delinquent. (*Id.*)

Section 14, which is entitled "Notice of Lien," explains that the owner shall have a lien on all personal property stored in the space pursuant to the Illinois Self Service Storage Facility Act ("Storage Act"), 770 Ill. Comp. Stat. §§ 95/1-95/7; that

---

[2] Unless otherwise noted, the following material facts are undisputed or are deemed admitted due to a party's failure to comply with Local Rule 56.1, which this Court strictly enforces.

the lien attaches as of the date that the personal property is brought to the premises; and that the owner may enforce the lien by selling or otherwise disposing of the personal property stored in the space. (LR 56.1(a)(3) ¶ 7.)

Finally, the contracts state that "[a]ll notices from Owner or Manager shall be sent by first-class mail postage prepaid to Occupant's last known address or to the electronic mail address provided by the Occupant in this Rental Agreement. Notices shall be deemed given when deposited with the US Postal Service or when sent by electronic mail. All statutory notices shall be sent as required by law." (*Id.*)

Nicholson reviewed the contracts prior to executing them on November 23, 2013. The occupant information listed on the contracts was Noah Nicholson, 1160 S. Michigan Ave., Chicago, Illinois. The Customer Information Form completed and signed by Nicholson the same day listed the Michigan Avenue contact address and an employer address of 5758 W. Fillmore St., Chicago, Illinois, and it noted Nicholson's agreement to provide written notification of any changes to his contact address. (*Id.* ¶¶ 9-11.)

Nicholson admitted that he did not provide Smart Stop with a written notification of an address change on any of the three storage accounts until January 20, 2016, at which time he completed a form stating his new residential address was 17037 Janine Court, Orland Park, Illinois. (*Id.* ¶ 12.)[3]

---

[3] Although there was no formal notification of the change until January 20, 2016, Smart Stop listed the Orland Park address on a payment receipt dated August 31, 2015. (LR 56.1(a)(3) ¶ 16; LR 56.1(b)(3)(B) ¶ 12.) The record is unclear whether the address was changed in Smart Stop's system, or whether the address was separately keyed in on the receipt. Furthermore, as discussed below, notices of lien were sent to the Orland Park address in October 2015.

On August 15, 2015, a Smart Stop employee spoke with Nicholson to advise him that he was late on the rent for all three units, that a foreclosure auction was forthcoming, and that he had to pay the entire balance through certified method of payment to avoid the auction. (*Id.* ¶ 15.) On August 31, 2015 Plaintiff paid $3600 to Smart Stop in the form of a cashier's check, an amount that satisfied rent owed for June, July, and August plus applicable fees for all three units. (*Id.* ¶¶ 16-17.) As of September 1, 2015, the monthly rent on unit 3008 was $315, unit 3429 was $826, and unit 3417 was $301.50.[4] (*Id.* ¶ 18.)

On October 1, 2015, defendant Extra Space took over the storage facility from Smart Stop; it continued to honor all of Smart Stop's storage rental agreements, including those with Plaintiff. (*Id.* ¶ 14.)

As of October 10, 2015, Plaintiff had failed to pay the monthly rent due for both September and October, and Plaintiff owed Extra Space the following amounts in combined rental and late fees: $2067.40 for unit 3429, $898.60 for unit 3008, and $856.00 for unit 3417; the total amount owed was $3822.00. (*Id.* ¶¶ 19-20, 24.) That same day, Extra Space mailed three Notice of Lien and Foreclosure Letters, one per unit, to Noah Nicholson at the Michigan Avenue address listed on the agreements. (*Id.* ¶ 27.) The letter contained an itemized statement of the unpaid rent and fees owed on each unit; the date on which the total amount was due; the name, address, and telephone number of the Ogden facility; the date, time, location, and manner of

[4] Plaintiff disputes the monthly rental rate given in Defendant's Local Rule 56.1 statement by incorrectly citing to the rates listed in the original November 8, 2013 contracts. (LR 56.1(b)(3)(B) ¶ 18.) In his deposition, Nicholson admitted that the rental rates cited by Defendant were correct as of September 1, 2015. (LR 56.1(a)(3) ¶ 18.)

the upcoming foreclosure auction, which was scheduled for November 18, 2015 at 10:00 a.m.; a demand for payment within fifteen days; and a statement in bold advising that if the total amount was not paid within fifteen days, a lien would be imposed, and the property will be sold at auction to satisfy the lien. (*Id.* ¶ 28.) An Extra Space representative, Tony Chenoweth, mailed six more letters on October 17, 2015 and received Certificates of Mailing from the postal service indicating six letters were mailed from the Berwyn Post Office. Three were addressed to the Orland Park address, three others were addressed to an address located at 5758 W. Fillmore St., Chicago, Illinois. (*Id.* ¶¶ 29-33.) Of the nine notice letters sent to Nicholson in October 2015, only the three sent to the Orland Park address were not returned as undeliverable. (*Id.* ¶ 34.)

According to Extra Space, its employees called Nicholson six times between October 10 and November 16, 2015 to discuss the delinquency issue. However, Defendant claims that Nicholson never answered the telephone calls and did not return the voice messages left on his mobile phone. (*Id.* ¶ 35.) Plaintiff denies that any of these communications mentioned a foreclosure sale; he believed they were calling with regard to his September rent being thirty days late, not to tell him the accounts were in foreclosure. (LR 56.1(b)(3)(B) ¶ 35.)

On October 28, 2015, Nicholson mailed a check in the amount of $1500.00 to the Ogden Avenue storage facility. (LR 56.1(a)(3) ¶ 21.) The check was drawn on the church's business account, and the memo line referred to "3008, 3429, 3417" and the

account number. No further instructions were given as to how the $1500.00 was to be applied toward the amounts owed on the three units. (*Id.* ¶ 22-23.)

Extra Space rejected the October 28, 2015 check. Its stated reasons for rejecting the check are based upon Section 2 of the rental agreement, which provides that Extra Space can reject partial payments; payments for units in foreclosure status are to be paid only by certified check, cashier's check, money order, or cash; and Extra Space reserves the right to require that rent and other charges be paid by only certified methods of payment. (*Id.* ¶ 25.) Plaintiff did not attempt to pay the monthly rent due on all three units on November 1, 2015 by any method. (*Id.* ¶ 26.)

On November 2 and November 9, 2015, Extra Space ran advertisements in the Chicago Sun-Times concerning lien foreclosure auctions that would occur on November 18, 2015 at 10:00 a.m. at the Ogden Facility. Units 3008, 3429, 3417 were listed in both advertisements, and Noah Nicholson was identified as the occupant of each unit. (*Id.* ¶ 36-37.) On approximately November 10, 2015 Extra Space created online auction listings for unit 3008 and 3429 on a website called www.storagetreasures.com.[5] (*Id.* ¶ 38.) The auctions ended on November 18, 2015 at 10:00 a.m., which was seventy-seven days after the September 2015 rent payment was due. (*Id.* ¶ 39.)

---

[5] Although notices of lien were sent for all three units rented at the Ogden facility, One Way's complaint relates only to units 3008 and 3429, because unit 3417 was not foreclosed on. Neither party has explained the full payment history of that unit and/or why it was the only unit not subject to foreclosure.

The Storage Treasures website allows potential buyers to submit blind, anonymous bids to purchase the contents of listed storage units. (*Id.* ¶ 40.) The identity of bidders is not known during the pendency of the auction, and only when the auction is closed does the storage facility receive an email identifying the individual who won the auction and the amount of the winning bid. (*Id.* ¶ 41-42.) The winning bidder on One Way's two units was Terrill Kirk. He testified that he decided to purchase the property based upon photographs included with the online listings, and that because there were multiple bidders involved in the auctions, it drove up the prices. (*Id.* ¶ 43-45.) Kirk stated that he did not communicate with anyone from Extra Space regarding the auctions while they were active; the first time they spoke with after the auctions had ended. (*Id.* ¶ 46.) Kirk had been involved in the business of buying storage lockers for twenty-one years. He estimated that he may have purchased hundreds of units from the Ogden facility during that period of time. (LR 56.1(b)(3)(B) ¶ 41.)

**DISCUSSION**

## I.  LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must draw all reasonable inferences in favor of the nonmovant. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001).

However, once the movant has carried its burden under Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The party opposing summary judgment must offer admissible evidence in support of his version of events, and hearsay evidence does not create a genuine issue of material fact. *McKenzie v. Ill. Dep't of Transp.,* 92 F.3d 473, 484 (7th Cir. 1996); *see Larimer v. Dayton Hudson Corp.,* 137 F.3d 497, 500 (7th Cir. 1998) ("'If the non-moving party bears the burden of proof on an issue, . . . that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact.'") (citation omitted). "The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion. . . . The nonmovant will successfully oppose summary judgment only when it presents 'definite, competent evidence to rebut the motion.'" *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.,* 278 F.3d 693, 699 (7th Cir. 2002) (citations omitted); *see also Hall v. Bodine Elec. Co.,* 276 F.3d 345, 354 (7th Cir. 2002) ("Conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact.").

"In considering a motion for summary judgment, this court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies." *Pleniceanu v. Brown Printing Co.,* No. 05 C 5675, 2007 WL 781726, at *7 (N.D. Ill. Mar. 12, 2007) (citing *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892,

898 (7th Cir. 2003)); *see Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir.

2005). Finally, the Court is "'not required to draw every conceivable inference from

the record.'" *McCoy v. Harrison,* 341 F.3d 600, 604 (7th Cir. 2003) (citation omitted).

## II.    ANALYSIS

Defendant argues that summary judgment is appropriate because it complied

with the Storage Act when it sold Plaintiff's property; it had not breached its

agreements with Plaintiff; it did not convert Plaintiff's property; and there was no

collusion between Extra Space and Kirk.

### A.    <u>Breach of Contract</u>

Defendant moves for summary judgment on the breach of contract claim on

the basis that Plaintiff breached its contract through non-payment, and Extra

Space properly enforced its lien in compliance with the Storage Act, which provides:

> The owner of a self-service storage facility…ha[s] a lien upon all
> personal property located at a self- service storage facility for rent,
> labor or other charges, present or future, in relation to the personal
> property, and for expenses necessary for its preservation, or expenses
> reasonably incurred in it sale or other disposition pursuant to this Act.
> The lien provided for in this Section attaches as of the date the
> personal property is brought to the self-service storage facility shall be
> superior to any other lien or security interest except for a statutory
> lien or security interest which is perfected through filing and has been
> perfected, prior thereto, through proper filing.

770 Ill. Comp. Stat § 95/3. The Act further explains the method by which a lien for

claim that has become due may be satisfied, which will be discussed below. *See id.* §

95/4.

## 1.    ***Non-Payment of Rent***

The parties first disagree about whether Plaintiff owed rent and late fees that would have triggered Defendant's lien rights to begin with. Defendant asserts that as of October 10, 2015, Plaintiff owed a total of $3822.00, representing two months' rent and late fees because Plaintiff had failed to pay monthly rent on September 1 and October 1 as required by the contract. The monthly rent on unit 3429 was $826, unit 3008 was $315, and unit 3417 was $301.50. Defendant claims it properly rejected Plaintiff's $1500 check sent on October 28 for three reasons. First, the check's memo line referencing all three units, with no further instructions as to how the check proceeds were to be applied, was reasonably interpreted as an attempt to pay for the combined amount owed on all three units. Accordingly, Defendant considered it a partial payment, and the contract gives Extra Space the discretion to reject partial payments. Second, the contract provides that all payments made to satisfy outstanding lien amounts must be via certified check, cashier's check, money order, or cash. Third, the contract reserves Extra Space's right to require guaranteed payment even if the account is not in lien status.

Plaintiff responds that Defendant could have accepted the $1500 check to cover back rent and further that it was not required to send a certified check. Plaintiff contends "there is no doubt that it [wa]s the intent of the parties to keep the property from going into a foreclosure sale," and thus "Defendant was contractually and morally obligated to use the entire $1,500.00 to stop the foreclosure sale of Plaintiff's property." (Pl.'s Mem. in Opp'n at 5.) Plaintiff alleges

that Defendant should have treated the $1500 check in a manner that would have forestalled the foreclosure sale. First, Plaintiff suggests that Defendant could have applied the check to the September 1 rent owed for two or three units, leaving only the October 1 rent due and owing. Plaintiff is correct that $1500 would have been just enough to pay the September rent on units 3429 ($826) and 3008 ($315) plus $228.20 for late fees and the $125 lien fee assessed on accounts more than thirty days late, an amount totaling $1494.20.[6] Alternatively, Plaintiff believes that the funds could have been used to pay the entire amount owed for both September and October rent on one of the lower-priced units.

Plaintiff's brief does not dispute that the contracts provide that Extra Space has the "sole discretion . . . [to] accept or reject partial rent payments." (LR 56.1(a)(3) ¶ 7.) Plaintiff also does not dispute that the same paragraph of the contract provides that "acceptance of a partial rent payment made to cure a default for non payment [sic] of rent shall not delay or stop foreclosure on Occupant's stored property." (LR 56.1(a)(3) ¶ 7.) Plaintiff is of course correct that Defendant could have applied the October 28 to cover September rent and fees for both units or September and October rent and fees for the smaller unit. However, Plaintiff has not shown that the contract required Defendant to do so. The plain language of the contract allows Extra Space to reject partial rent payments. Plaintiff's argument that the

---

[6] Plaintiff calculates that the check could have covered September rent for all three units. This calculation not only omits the late fee and lien fee, it uses rent figures from 2013 ($771, $291) for units 3429 and 3008. Nicholson admitted in his deposition that the rates applicable in September and October 2015 were $826 and $315 for units 3429 and 3008. (LR 56.1(a)(3) ¶ 18.) Using the proper figures, the check would not have been sufficient to pay rent for all three units.

$1500 check was not a partial payment because it would have covered an entire month or an entire unit is unpersuasive. Two full months' rent and fees were owed on the units as of October 28. Plaintiff offers no case law supporting its theory that payment of only one of the two months' rent owed was anything other than a partial payment.

Furthermore, the undisputed facts of the case do not support Plaintiff's notion that the $1500 check should have been accepted as full payment for one unit. Plaintiff contends that there were three separate and independent contracts governing the three units, and Extra Space improperly combined them when determining whether the $1500 check was partial payment. But Plaintiff does not dispute that the memo line of the check listed all three units Plaintiff was renting at the Ogden facility, and Plaintiff gave no further written or verbal instructions as to how to apply the funds. It was therefore reasonable for Extra Space to assume that the check was intended as a partial payment for all three units. Indeed, the fact that Plaintiff offers alternative theories of how the check could have been applied strongly suggests that the check was not sent with any particular intention to pay for September rent or to bring a single unit's rent up to date.

Plaintiff's contention that it should not have been required to pay with a certified check or other guaranteed form of payment also fails. Plaintiff's confusing and illogical argument is that if Defendant had accepted the private business check on October 28 for the September 1 rent, then as of October 29, 2015, "Plaintiff would not have been more than 30-days days late for the October 1, 2015 rent to

require a certified bank check." (Pl.'s Mem. in Opp'n at 6.) First, as stated above, Extra Space had reserved the right to require guaranteed payment at any time, even if an account was not in arrears. Second, the contract clearly required all payments made in satisfaction of outstanding lien amounts to be guaranteed. It is also undisputed that the lien fee attached to an account thirty or more days delinquent. Thus, even if it can be assumed that the October 28 check was intended to pay the September 1 rent, the account was well over thirty days delinquent, requiring a guaranteed form of payment. Plaintiff is correct that had Defendant accepted the October 28 check for September rent, then as of October 29 a bank check would not have been required to pay the October 1 rent, but that is irrelevant. The issue is not whether any checks written on October 29 were required to be guaranteed; in fact, there were none. The issue is whether the contract required the October 28 check to be guaranteed, and it did. Extra Space's decision to refuse the check was therefore allowed by the contract as a matter of law.

### 2. *Notice of Foreclosure*

The Storage Act includes specific requirements for satisfying a lien under the Act. The occupant must be provided notice, delivered in person or by verified mail or e-mail to the occupant's last known address. 770 Ill. Comp. Stat. § 95/4(A)-(B). The notice is "presumed delivered when it is deposited with the United States Postal Service, and properly addressed with postage prepaid or sent by electronic mail and the owner receives a receipt of delivery to the occupant's last known address, except if the owner does not receive a receipt of delivery for the notice sent by electronic

mail, the notice is presumed delivered when it is sent to the occupant by verified mail to the occupant's last known mailing address." *Id.* § 95/4(D). The statute provides that the notice must include certain information, such as the amount due at the time of notice; the name and location of the storage facility; a demand for payment within a specified time not less than fourteen days after delivery of the notice; and a conspicuous statement that unless the claim is paid, the property will be advertised for sale or other disposition at a specified time and place. *Id.* § 95/4(C).

After the expiration of the time given in the notice, the storage facility must publish an advertisement of the sale once a week for two consecutive weeks in a newspaper of general circulation where the facility is located. *Id.* § 95/4(E). The sale must be held at the storage facility, and a sale held on an online publicly accessible website is deemed to be held at the facility. *Id.* § 95/4(G). Prior to the sale, the occupant of the unit may redeem the property by paying the amount necessary to satisfy the lien plus the reasonable expenses incurred in satisfying the lien. *Id.* § 95/4(H). The sale and its proceeds are considered commercially reasonable if three or more bidders unrelated to the owner are in attendance. *Id.* § 95/4(L). The parties disagree about whether proper notice was given and whether the sale was commercially reasonable.

### a. Notice

Defendant argues that it complied with the notice requirements when on October 10, 2015, it sent three letters (one for each unit) to Noah Nicholson, 1160 S.

Michigan Ave., Chicago, Illinois, which was Plaintiff's last known mailing address on file at the time the notices were sent, and by sending additional letters to Plaintiff's business address in Chicago and to 17037 Janine Court, Orland Park, Illinois, which Nicholson acknowledges is his current home address. It is undisputed that the letters sent to the Orland Park address are the only ones that were not returned to Extra Space as undeliverable. However, Plaintiff contends that he never received notice of the foreclosure sale, and he only learned about it after the fact when he went to the facility to inquire about One Way's property.

According to Defendant, its method of notice satisfied the Storage Act, because it "does not require that the delinquent occupant actually receive the notice letter before foreclosure auction can occur. To the contrary, the Storage Act's only requirement is that notice by mail be deposited at the US Post Office, which was undisputedly done by Extra Space on all nine letters." (Def.'s Mem. in Support of Summary J. at 8.) Although the contracts provide that notices from the owner "shall be deemed given when deposited with the U.S. Postal Service," (Def.'s Ex. B at 88), Defendant's motion is premised on its compliance with the Storage Act, not the contract. The Storage Act provides that notice is not presumed delivered unless is "it is deposited with the United States Postal Service, and properly addressed with postage prepaid . . . *and the owner receives a receipt of delivery to the occupant's last known address.*" 770 Ill. Comp. Stat. § 95/4(D) (emphasis added). Accordingly, in order to enjoy the advantages of the statutory presumption that the notice was delivered, Extra Space was required to show a receipt of delivery. Extra Space has

only offered evidence that letters were mailed, not that a return receipt was requested or received, and therefore the presumption does not apply. Moreover, even if the Court were to agree that notice can be presumed in this case, Extra Space has offered no case law establishing that the presumption is irrebuttable. Without documentary proof of receipt, and in light of Nicholson's unequivocal denial that he received any notice, a material issue of fact remains on this issue. *See Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) ("[W]e long ago buried – or at least tried to bury – the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving.' . . . If based on personal knowledge or firsthand experience, such testimony can be evidence of disputed material facts.") (citation omitted).

### b.    Auction

Defendant claims that the sale of Plaintiff's property was commercially reasonable because it was administered through publicly accessible online website, through which individuals from around the world can submit anonymous bids to purchase units listed on the website, and Extra Space does not know the identity of the bidders while the auction is taking place. Terrill Kirk, the highest bidder, went to the Ogden facility shortly after the auction closed, paid the bid price, and took possession of the property.

Plaintiff suggests that the sale was not commercially reasonable because Extra Space employee Tony Chenoweth may have colluded with Kirk prior to the auction. Specifically, Plaintiff points to Chenoweth's testimony "that he does not

know Kirk's full name, which implies he knows his first name; Tony that he had been purchasing storage units for twenty-one years, and had bought units from the Ogden facility possibly hundreds of times. He does not know Kirk personally, which implies he knows him in some other capacity." (Pl.'s Mem. in Opp'n at 7.) Plaintiff also finds it suspicious that Kirk would pay over $2000 for each unit based solely on the pictures listed on the website, and although he sold most of the items within a month of the auction, he does not remember who he sold them to. Plaintiff invites the Court to allow a trier of fact "to observe their faces and body language, as well as the totality of the circumstances," to determine whether collusion occurred. (*Id.* at 8.)

The Court agrees with Defendant that a trier of fact could not reasonably infer collusion. The auction was accomplished after the required two weeks of newspaper notification and through a publicly accessible website. The fact that Chenoweth and Kirk may have met before is insufficient to withstand summary judgment, given the volume of Kirk's purchase of storage units for many years. And because it is not disputed that Kirk purchases and sells a high volume of goods, no reasonable inference of collusion can be drawn from the fact that he did not remember who purchased the goods a year and a half after the fact.

### B.    Conversion

Under Illinois law, a plaintiff claiming conversion "'must establish that (1) he has a right to the property; (2) he is an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4)

the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property.'" *Hausen v. PS Ill. Tr.*, No. 11 C 6888, 2012 WL 266169, at *7 (N.D. Ill. Jan. 29, 2012) (quoting *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998)). Defendant correctly argues that One Way cannot establish it had an absolute right to the immediate possession of the property because Extra Space had valid lien rights in it. Plaintiff does not respond to this argument and instead argues there was collusion between Chenoweth and Kirk. The Court holds that "the fact that [One Way] failed to pay [Extra Space] the monthly rent means that they did not have an absolute and immediate right to possess the property in the storage unit." *See Hausen v. PS Ill. Tr.*, No. 11 C 6888, 2012 WL 266169, at *7 (N.D. Ill. Jan. 29, 2012) (dismissing conversion claim against storage facility); *see also Lewis v. Nat'l City Bank*, 814 F. Supp. 696, 699 (N.D. Ill. 1993) (holding that a conversion claim must fail where there is "no absolute and unconditional right" to property due to a loan default). Summary judgment therefore must be granted as to the conversion claim.

## **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. No. 39] is granted in part and denied in part. It is denied as to whether proper notice of the sale was given and granted in all other respects.

**SO ORDERED.**                    **ENTERED:**

**DATE:** ____**May 19, 2017**    _____
                                  **HON. MARIA VALDEZ**
                                  **United States Magistrate Judge**